IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Vincent Dobrski, | ) | Case No.: 1:09CV963 |
| | ) | |
| Plaintiff, | ) | Judge Benita Y. Pearson |
| v. | ) | |
| | ) | Magistrate Judge Kenneth S. McHargh |
| | ) | |
| Ford Motor Company, | ) | **REPORT & RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

Before the Court is Defendant's Motion To Dismiss Plaintiff's Complaint Or, in the alternative, Motion For Sanctions (Doc. 60), Plaintiff's Motion To Extend Discovery (Doc. 57), and Plaintiff's Motion To Deny Further Delay (Doc. 62). For the reasons set forth as follows, the undersigned recommends that Defendant's request for dismissal be denied and that sanctions, as determined following a hearing, be imposed. Additionally, Plaintiff's motions to extend discovery and to deny further delay are denied.

## BACKGROUND

Plaintiff initially filed this action in the Cuyahoga County Court of Common Pleas on August 3, 2007, and Ford removed the case to this Court on Septmenber 11, 2007. *See* (Case No. 1:07-CV-02736, at Doc. 1). On January 31, 2008, Plaintiff's counsel filed a motion to withdraw as counsel of record, citing Ohio Disciplinary Rule 1.16(b)(6). (*Id*. at Doc. 11). Plaintiff, through his new counsel and with a stipulation from Ford, voluntarily dismissed the case without prejudice on April 29, 2008.

(*Id* at Doc. 22). Plaintiff, represented by his third counsel,[1] refiled this case on April 27, 2009, alleging nine different causes of action. (Doc. 1).

On June 26, 2009, Defendant filed a motion to dismiss Plaintiff's case in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. 5). On March 16, 2010, the Court granted Ford's motion in part and granted Plaintiff 14 days in which "to amend his whistleblower retaliation claim to see if he c[ould], in good faith, assert a cause of action under O.R.C. § 4113.52(A)(3)." (Doc. 14). Plaintiff filed his Amended Complaint on March 29, 2010, alleging a single claim of whistleblower retaliation in violation of O.R.C. § 4113.52(A)(3). (Doc. 15).

On February 24, 2011, counsel for non-party witness, the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("the UAW"), filed a motion requesting that the Court order Plaintiff to "cease and desist from having any contact with the UAW, its members, employees, officers and agents, and to protect all and each of them from harassment, threats and/or interference by [] Plaintiff." (Doc. 38). On March 2, 2011, Ford requested a stay of the proceedings to investigate the alleged misconduct by Plaintiff in connection with certain witnesses, as set forth in its motion filed on that date. (Doc. 41). On March 4, 2011, the Court held a status conference during which it granted Ford's request and allowed Ford 30 days in which to investigate Plaintiff's alleged misconduct.[2] (Doc. 42). The Court also ordered Plaintiff to "have no contact with the UAW's members, employees, officers, and agents, or any other witness, other than through counsel" (hereinafter referred to as the "March Order"). (*Id.*)

---

[1]The merits of this action were originally before Judge Kathleen O'Malley in Case Number 1:07-CV-2736. At the time of the filing, Plaintiff was represented by Attorney Eric Hall. After Attorney Hall withdrew from the case, Attorney Robert Bauders filed a Notice of Appearance on Plaintiff's behalf (Doc. 14). That case terminated when Judge O'Malley approved the parties' Stipulation of Dismissal Without Prejudice. When the instant action was filed, Plaintiff was represented by his third attorney, Jason Mizak.

[2]This discovery was solely limited to investigating Plaintiff's alleged harassing conduct.

2

On March 28, 2011, Plaintiff's attorney, Jason Mizak, abruptly filed a motion to withdraw, citing Ohio Disciplinary Rule 1.16(b)(6), as did Plaintiff's previous counsel. (Doc. 44). After a status conference on March 31, 2011, the undersigned granted Attorney Mizak's motion, and granted Plaintiff 30 days to secure new counsel, consequently delaying the completion of Ford's investigation. (Doc. 47). On April 27, 2011, Ford notified the Court that Plaintiff allegedly violated the Court's March Order by contacting one of the UAW's employees. (Doc. 50).

On May 2, 2011, the Court held an in-person status conference. As part of its investigation, Ford sought to propound interrogatories upon Plaintiff and requested to depose Plaintiff solely regarding his alleged misconduct. After failing to obtain new counsel, the Court ordered that Plaintiff be deposed without counsel. (Doc. 55). Plaintiff's deposition was taken on May 19, 2011, in the undersigned's chambers. At several points during the pendency of the deposition, Ford requested the Court's assistance arguing that Plaintiff was being uncooperative and engaging in inappropriate conduct during the deposition. As a result, the undersigned was compelled to "sit in" on the deposition to oversee the process, and at times compelled to direct Plaintiff to give responsive answers to Defendant's questions.

## **FORD'S INVESTIGATION**

Ford contends that Plaintiff committed egregious conduct toward four potential witnesses: Kevin Kalinowski ("Kalinowski"), Brian Goff ("Goff"), Jimmie Williams ("Williams"), and John Cain ("Cain"). Ford named Kalinowski and Goff as individuals likely to have discoverable information in its initial disclosures. (Doc. 60, Ex. B, at 4).

Kalinowski is the President and Chairman of UAW Local 420 and was involved in Plaintiff's grievances filed against Ford. (Doc. 38, Ex. 5, at 7-13). Kalinowski testified that he contacted the police in April of 2007 after Dobrski began making threatening and harassing telephone calls to his home. (*Id.* at 41-42). The phone calls were alarming to Kalinowski because although Dobrski had never been invited to his home, Dobrski's prank phone calls referenced intimate details regarding

3

Kalinowski's home and family (i.e. how many children Kalinowski had and where Kalinowski parked his car). (*Id.* at 42). Eventually, Kalinowski purchased a phone trap in order to confirm that the number from which he was receiving the calls belonged to Dobrski. (*Id.*). Even after filing the police report, Kalinowski stated that he received between 70 to 80 phone calls each day at various times throughout the day. (*Id.* at 43). In fact, on the day of Kalinowski's deposition, February 11, 2011, he testified that Plaintiff had called him 16 times in 40 minutes. (*Id.*) Although Kalinowski admitted that these phone calls ceased after the Court issued its March Order, he indicated that the calls resumed in mid April of 2011, though Kalinowski has refused to answer any of these calls. (Doc. 51, Ex. 2).

Goff is a bargaining committeeman at large for UAW Local 420 and participated in the union's grievance process by filing a grievance on Dobrski's behalf. (Doc. 38, Ex. 4, at 7-12). Goff also testified that Plaintiff placed threatening and harassing phone calls to his home both during the day and the evening. (*Id.* at 25). The deplorable content of the phone calls included offensive names which Dobrski used to refer to Goff (i.e. "a__hole", "cunt" or "dildo"), false accusations Dobrski made that Goff molested his stepchildren, and statements Plaintiff made threatening to rape Kalinowski's family and "f__" Goff into the ground if he did anything to help Kalinowski. (*Id.*) In or around February of 2010, Goff contacted the Tallmadge, Ohio Police Department regarding these phone calls; a police officer telephoned Dobrski and ordered him to stop calling Goff. (*Id.*) Since that time, Goff has not received any further calls from Dobrski. (*Id.* at 26). However, Goff saved many of the tapes from his answering machine which contain messages that Dobrski left. (*Id.*).

Williams was the Servicing Representative for the National Ford Department of the UAW during the relevant time period and worked in various aspects of Plaintiff's grievance against Ford; he currently serves as the Human Relations Director of the UAW. (Doc. 38, Ex. 1, at 1). Williams works in Detroit, Michigan. He indicated that since April of 2010, Plaintiff has called his cell phone approximately 1,000 times. (*Id.*) During the calls Plaintiff threatened Williams and used racial slurs and profanity. (*Id.* at 2). Williams claimed that Dobrski even used this offensive language when

4

Williams's 10 year-old daughter answered his phone on one occasion. At some point, Williams contacted the Detroit Police Department in order to stop Plaintiff's harassing phone calls, but his efforts were unsuccessful because Dobrski lived outside of the department's jurisdiction. (*Id.*) Williams contends that he has received 12 harassing calls from a blocked number since the issuance of the Court's March Order. (Doc. 51, Ex. 1). On one of the calls, he recognized the voice as that of Plaintiff. (*Id.*)

Cain was Plaintiff's co-worker at Ford. (Doc. 38, Ex. 3, at 7). He testified that Plaintiff engaged in a pattern of harassing behavior toward him. Cain stated that Dobrski tried to run him off the road while yelling obscenities out of his window. (*Id*. at 17-18). Cain also testified that in or around February of 2010, while he was driving past Plaintiff's home on his way home from work, Plaintiff again yelled obscenities at him and took several photos of him. (*Id.* at 19).

In the final analysis, Ford's investigation provided little in the way of new facts to supplement the allegations originally submitted in its motion to stay the proceedings, which included excerpts from deposition testimony and affidavits provided by potential witnesses. The most significant "new" information, bearing on the motion before the Court, was Mr. Dobrski's conduct following the Court's issuance of the stay and during his deposition. Ford's ability to complete its investigation was thwarted by Mr. Dobrski's lack of cooperation, which the Court is convinced played a large role in his third retained counsel asking to withraw from his continued representation. Ultimately, that same conduct required the Court to have to "babysit" Plaintiff's deposition, in order to bring this interruption in the prosecution of the case to a close.

**FINDINGS OF FACTS AND CONCLUSION OF LAW**

There can be no doubt that the Court has the authority, indeed, the responsibility to ensure that all parties have a fair opportunity for their cause to be heard. It is understood that "[c]ourts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." *Chamers v NASCO,*

5

*Inc.*, 501 U.S. 32, 43 (1991) (citations omitted). Included in this inherent power is "the power to punish for contempts," including "both conduct before the court and that beyond the court's confines[.]" *Id.* (citations omitted). Moreover, "a federal court's authority to protect the integrity of its proceedings encompasses the authority to take reasonble actions to avoid intimidation or coercion of witnesses." *U.S. v. Vasilakos*, 508 F.3d 401, 411 (6th Cir. 2007). While the Court concludes that Ford has not demonstrated facts sufficient to warrant dismissal, the totality of Plaintiff's conduct explains Ford's pursuit of that remedy and serves to justify the imposition of sanctions.

## **DISMISSAL**

The Sixth Circuit weighs four factors when considering whether to involuntarily dismiss a complaint: 1) whether the party's conduct is due to willfulness, bad faith, or fault; 2) whether the adversary was prejudiced by the the dismissed party's conduct; 3) whether the dismissed party was warned that the failure to cooperate could lead to dismissal; and 4) whether less drastic sanctions were imposed or considered before dismissal of the action. *Mulbah v. Detroit Bd. of Educ.*, 261 F.3d 586, 589 (6th Cir. 2001).

### 1. Willfulness, Bad Faith, or Fault

Allegations of witness misconduct were first brought to the Court's attention in February of 2011. Shortly thereafter based upon a sufficient demonstration of potential harm, on March 4, 2011, the Court issued an order of protection to prevent harassment of non-party witnesses by Plaintiff and stayed the proceedings pending an investigation into the allegations. It was at that time Plaintiff was warned that a failure to comply with the Court's order could include sanctions, up to and including potential dismissal of the case. *See* (Doc. 42, at 2).

Much of the conduct which Ford submits to support its motion occurred prior to the date the Court issued the March Order and was revealed during depositions of Kalinowski, Goff and Cain which took place in February 2011. For example, Kalinowski testified regarding specific conduct, including threats, that began in 2007, prior to the case being removed to federal court. (Doc. 60, Ex. A).

6

Likewise, the most egregious conduct allegedly directed toward Brian Goff appears to have occurred in the Spring of 2010. (Doc. 60, Ex. C). Indeed, many, if not all of the taped conversations played during Dobrski's deposition in Chambers, involved alleged conversations between Dobrski and Goff that took place early in the case after, according to Defendant, "the Court instructed Plaintiff to work cooperatively with the UAW to obtain copies of documents Plaintiff claimed were relevant to his case and to exhaust his administrative remedies." (Def.'s Memo. at 7). Dobrski's response to Ford's iteration of the Court's instruction was that he "agreed in part . . . [but that he] d[id] not agree that Judge O'Malley used the word 'cooperate'". (Pl.'s Br. at 7) (internal parenthesis omitted). Plaintiff's response is telling as it reflects an attitude that proves a disservice to Dobrski and to the orderly disposition of this case. Furthermore, Plaintiff attempted to justify his behavior by stating, "[w]hy should I be blamed for trying to keep tabs on my case". (*Id.*) This statement demonstrates that Plaintiff's conduct was willful and bolster's the undersigned's belief that Plaintiff's behavior was purposely committed in a harassing manner.

Dobrski's post-warning conduct is by no means inspiring. Since the Court's March Order was issued, Defendant filed affidavits from Williams and Kalinowski alleging that Dobrski resumed his habit of placing harassing calls to these potential witnesses. (Doc. 51). Williams attested that he received 12 calls of a suspicious nature between April 22, 2011 and April 30, 2011. (Doc. 51, Ex. 1). Eleven of the calls were blocked numbers with only music being played. (*Id.*) On April 24, 2011, Williams claims to have recognized Dobrski's voice, calling Williams a, "m___f___", then hanging up. (*Id.*) Similarly, Kalinowski indicated that although Dobrski's calls ceased for a period of time after the March Order, during the end of April he began to receive calls from a blocked number, typical to Dobrski's prior calling pattern. (Doc. 51, Ex. 2). However, the undersigned notes that Kalinowski admitted that he could not confirm that Dobrski initiated these calls. (*Id.*)

Most significant is Plaintiff's conduct during his deposition held in Chambers. The scheduling of the deposition had been delayed by the withdrawal of Dobrski's counsel which, in part, appears to

7

have been precipitated by Mr. Dobrski's failure to cooperate. From the outset of the deposition, Ford's counsel was forced to seek Court intervention on multiple occasions. Eventually, the Court decided it necessary to monitor a portion of the deposition to prevent further delay in the completion of the investigation, particularly since Dobrski presented without representation. Dobrski's conduct, even in the presence of the Court, bordered on the bizarre. During questioning regarding a series of recorded conversations represented to be between Goff and Dobrski, Plaintiff's evasive and contradictory answers regarding the identity of the speakers was troubling. Moreover, the Court concludes that Dobrski was, in fact, a participant in the conversations played in its presence. Much of Dobrski's language during those calls was reprehensible and could well be understood to create concerns in the targets of his vitriol. At the same time, however, the Court acknowledges that other parts of the conversations suggest that many of Dobrski's outbursts were ill-conceived by-products of a man frustrated at the loss of his job, and not sufficiently intended to obstruct pending litigation. Nevertheless, the Court is particularly troubled by Dobrski's apparent willingness to give flippant, contradictory or disingenuous testimony while under oath. (Doc. 60, Ex.1, at 16-19). For example, during Plaintiff's deposition he suggested that two men, Len Palmer ("Palmer") and Kenneth Painter ("Painter") were responsible for making the harassing calls to these potential witnesses. (Doc. 60, Ex. F, at 4-10). However, both of these individuals were deceased as of April 3, 2011, and therefore it would have been impossible for either of them to have been responsible for the calls made to Williams or Kalinowski after the Court's March Order. *See* (Doc. 60, Ex. I).[3] Therefore, the undersigned finds that Dobrski's attempt to shift blame to individuals who are now deceased to be devoid of credibility.

### 2. Prejudice To Adversary

Clearly, Plaintiff's hostile behavior has caused some amount of prejudice to Ford. Ford emphasized that each of the witnesses discussed herein sought protection from law enforcement as a

---

[3]It should be noted that the Court does not believe that either Palmer or Painter placed any of the calls which occurred prior to the March Order either.

8

result of Plaintiff's conduct. Additionally, Ford submits that Plaintiff's use of intimidation and threats has likely caused these witnesses to be hesitant to do anything that would reignite or inflame Plaintiff's deplorable behavior towards them. While Defendant's argument certainly carries some weight, the Court is not persuaded that Defendant's behavior has significantly lessened any witness's willingness to cooperate with Ford in its defense of this case. Instead, despite having to suffer from Plaintiff's harassing behavior, three of the witnesses appeared and testified on the record regarding Dobrski's behavior. In fact, it appears that the witnesses most directly affected and material to the sole claim remaining in this case, have already provided their testimony during depositions and the Court has no reason to believe they would not be available at trial.

### 3. Prior Warning & Less Drastic Sanctions

Plaintiff was warned that his failure to comply with the March Order could result in negative consequences, including a recommendation of dismissal of his case, and criminal or civil contempt. *See* (Doc. 42, at 2; Doc. 55, at 4). However, ultimately, the Court concludes that dismissal is not warranted for a combination of reasons. With the exception of Williams,[4] Ford has failed to provide clear and convincing evidence of misconduct toward witnesses occurring after the Court warned Plaintiff of these possible consequences. A significant number of the allegations prior to that time relate to conduct that took place long before the filing of the complaint currently before the Court. Other conduct appears to have largely occurred during the time Dobrski was encouraged to work with the union. While these factors do not necessarily excuse the conduct, if true, they do mitigate against a remedy so severe as dismissal. Under the circumstance, it is also difficult to determine how much of Dobrski's boorish conduct was a function of a lack of appropriate coping skills, rather an intentional

---

[4] Although in an affidavit, Williams claims to have recognized Dobrski's voice as the speaker in a call in April, 2011, the quality of that assertion alone would not warrant dismissal as it is not clear that Williams is a necessary witness to the claim currently pending before the Court.

9

attempt to disrupt the judicial process. Thus, Ford has failed to demonstrate sufficient prejudice to warrant the drastic remedy it seeks.

In the final analysis, the Court finds Ford's claims regarding Mr. Dobrski's conduct in connection with Kalinowski, Goff, Cain and Williams to be credible. When considered in conjunction with his apparent unwillingness to cooperate in the prosecution of this case, Ford's request for the ultimate sanction is not so outrageous. Although a close call, the Court concludes that dismissal is too harsh a punishment at this time because Ford has fallen short of demonstrating the requisite prejudice.

The Court acknowledges its reluctance to recommend a remedy that would deny a party an opportunity to resolve its case on the merits. However, the Court is equally concerned with ensuring that the parties conduct themselves in a manner that respects the role the Court plays in the orderly administration of justice which, of course, requires that all parties have a fair opportunity to present and defend their claims. Although not recommending dismissal, Mr. Dobrski must be held accountable for delays occasioned by his egregious conduct which, at minimum, has contributed to the delay in the prosecution of this case. Such is also necessary to ensure that he sufficiently understands the unacceptibility of any recurrence of similar conduct.

## CONCLUSION

The Court is satisfied that Ford has demonstrated that Plaintiff has engaged in a pattern of conduct which worthy of consideration for a significant sanction. Therefore, the undersigned recommends that Defendant's Motion To Dismiss Plaintiff's Complaint, or in the alternative Motion For Sanctions (Doc. 60) be **GRANTED IN PART and DENIED IN PART.** The Court recommends that Defendant's request for sanctions be **GRANTED**, and that Defendant's request to dismiss the complaint be **DENIED**. The Court's final recommendation on the nature of Defendant's sanction will be postponed until after a hearing on potential sanctions, all of which will be included in a Report and Recommendation to the District Court.

Plaintiff's Motion To Extend Discovery (Doc. 57) is **DENIED**. Pursuant to Judge O'Malley's Case Management Conference Plan all discovery was to be completed by March 1, 2011. (Doc. 22). Plaintiff has not shown good cause for reopening discovery. Plaintiff's Motion to Deny Any Further Delay (Doc. 62) is **DENIED** as moot as there are no further motions pending to delay the progress of this case.

**IT IS SO ORDERED.**


Date: <u>August 22, 2011</u>         /s Kenneth S. McHargh
                                     KENNETH S. MCHARGH
                                     U.S. MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days of mailing of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *see also United States v. Walter*s, 638 F.2d 947 (6th Cir. 1981).